Good morning, your honors. May it please the court. I'm Pam Harmon. I'm here on behalf of Zimmerman Ford, the appellant, and the employer in this matter. This case presents two questions for you, two fairly simple questions for you. The first is whether the booked-hour incentive pool earnings that Mr. D'Onofrio earned after he returned to work should be included in the computation of his wage differential. I submit to you that that is a straightforward analysis for this Court. When the Commission issued its decision, the ArcelorMittal steel case had not been issued. Last November, you issued that case that allowed, in the context of an average weekly wage calculation, the inclusion of a booked-hour bonus pool. And I submit to you since Section 8 allows that inclusion, either whether it's permanency or lost time, that it's proper to use it in the post-accident return-to-work calculations. The second question is a little bit more of a policy question, and that has to do with whether there's anything in the Act or the case law that confines the parties to one single round of vocational rehabilitation. And I submit to you that there is not. We've had voc rehab cases here for the last 30 years, and there's been many discussions on many elements there, but there's nothing in that case law that says you get a one-and-done shot. I'd like to go back to the booked-hour pool, because I think that is financially the one that impacts the case the most and has a larger approach overall. Car dealerships pay people on commissions. Various people earn various types of commissions depending on the position they're in. The testimony in this case alludes to the fact that car salesmen earn commission. In this case, the service writer, the guy who greets you when you pull your car in the garage door, is earning a percentage of whatever he can convince you to have done to your car. That doesn't make me particularly comfortable when I'm taking my car in for service, but that's the way it's set up. There is also other people, finance managers, get paid a percentage of what they're able to convince you to sell. That is income that those people earn in exchange for their labor. Their persuasive ability, their ability to convince you to get the rustproofing and the undercoating is directly determinative of how much money you are going to earn. The fact that in this particular dealership, and as John Kay, the owner of the dealer, testified to in other dealers that he has owned, the fact that the service writers pool the number of booked hours that those guys are able to sell and then divide them according to formulas, particular to the individuals, does not make that into a bonus that is gratuitous at the behest of the employer. It is merely one more way of saying that this is the way these fellows are being paid. Now, should you rely on counsel's argument, which is that the Arcelor case dealt with compelled inclusion of the booked hours because that was pursuant to a union contract, you're putting us in the position of saying you take one pay analysis for a union contract situation, but a different pay analysis for an at-will employee. Now, certainly we know there's distinctions between what a union fellow can do and what an at-will fellow can do, but in terms of looking at the elements of the work compact, how you compute the TTD, how you compute the average weekly wage, how you compute the wage differential and the money that the person is able to earn under Section 8D.1 afterwards does not distinguish between a union contract and an at-will employee. Thus, I submit to you for the reasons which you very cogently set forth in the Arcelor case last November, that the booked hour pool should be included in the calculations of Mr. D'Onofrio's return to work wages and that, and I laid out the calculations in my brief, the weekly stipend payable to him should be reduced. Let me move on as to whether that should be permanent or whether that should be temporary. After he had recovered from his second shoulder surgery, when it was fairly clear that he was not going to go back and be an auto mechanic again, Zimmerman offered vocational rehab. And while he was still recovering and going through his physical therapy in the spring of 2008 and late winter, efforts were begun to bring the fellow back to work. We assigned a voc rehab counselor, a man named Dan Minich. Minich worked with Mr. D'Onofrio. He helped him go back and get a third associate degree, a second associate degree on top of a bachelor's degree. I don't have three degrees. This guy's got more education nominally than I do. Helped him go back and get some more college. And then very shortly after he was released by the doctor, helped him find a job, found actually two of them. One was an offer down in Peoria with Caterpillar and the other one was up here in the far west suburbs with Zimmerman. I'm sorry, with DuPage Chrysler. Mr. D'Onofrio chose the job that he thought fit his requirements better. It was in the auto industry. It was something he knew how to do. There was the possibility of earning money that was reasonably commensurate to what he was earning as a mechanic. And so he took the DuPage Chrysler job. Flash forward from June of 2008 until January of 2009. And he is concerned that it takes him an hour and a half to get back and forth to work. Lots of us commute an hour and a half to work one way or the other. He wants a job that's closer to home. He wants a job that pays better. I think we'd all like jobs that pay better. And so he is open and amenable to the resumption of vocational rehabilitation. The record is unclear as to at whose request the vocational rehabilitation was reinitiated in January of 2009. I'm having a difficult understanding of what the real problem is because Minnich testified. He was cooperative with the first round of voc rehab. Minnich encouraged him to take the DuPage Chrysler job, correct? He began assisting him additionally, but Minnich himself testified the DuPage Chrysler job was a good fit. He earned similar wages. He's already there, and he characterized it as a successful outcome. So why does he have to continue on if they already have an opinion of the expert a successful outcome? Because there's two reasons there. One, because the more money that D'Onofrio earns, the smaller the amount of wage differential that Zimmerman has to pay. Well, we understand that, but is it only through the perspective of Zimmerman, or do you look at, doesn't the expert's testimony have a bearing on this? Well, I think the question becomes, is the successful outcome the only outcome? But if it's successful, can you get better? If I have my knee scope and I have a successful outcome and I don't get catching and tripping anymore, that's successful. Can I get back to running and jogging? Well, that's better than successful. It gets me back to my same basis. But the point is, is that D'Onofrio himself had some concerns about the job. He didn't like the hour-and-a-half commute, okay? And he wanted to make more money and be closer to home. And so he bought into this reoffer. And whether it was Zimmerman that initiated it in order to contain our expenses, contain our exposure, or whether it's D'Onofrio who bought into it because he wanted to work closer to home and earn more money, they both agreed. And just because you had a good outcome, a successful outcome at one level, does not, I submit to you, preclude ongoing services, especially if both parties agree, but even if they don't, ongoing services in order to do better. But what case law can you point to that tells us that the commission erred and not required? On the book rehab issue? Yes, the book rehab issue, not requiring a second go-around. What case law can you point to that says they erred as a matter of law? I cannot, sir, because I am unable to locate any case law that says one way or the other that a second round. But I submit to you that it is a good-faith extension of existing law or the absence of law that says to the contrary, that says you can't. For example, let's say we brought him back to work for Circuit City. I think that's one of the ones that went out of business. And he was back using his car expertise, selling and installing car stereos. Would we be, would he be precluded in coming back from us and saying they're out of business, I need help, what else can I do, what else would you do for me? That would have been a reason, a reason, a tangible reason why he would have come back to us in a completely hypothetical circumstance. If you say that there's no law that says that we have to, okay, I tell you that there's no law that says that we can't, okay. And it is certainly up to the bench here to make that decision to say whether we're looking at this in a proactive or in a negative sense. I don't think that it is fair to completely dismiss the concerns of an employer who wants to contain the financial outlay. Especially, and as I've argued in the policy portions of my brief, when this is a lifetime award that will not be reviewable once this becomes final. It is a balance of the equities to the various parties that I should have a shot, my employer should have a shot at containing its costs. You could say it's fair under these circumstances to make this temporary partial disability. Mr. D'Onofrio said he was interested in redoing Voc Rehab. It's in the record. I quoted the page. It's right there with the page citation. There's no need to go on a treasure hunt, as a couple of recent decisions have mentioned. Okay. If he's interested in it, we should be allowed to ameliorate our exposure, and he should have the obligation, which is equivalent to mitigation of damages or make it temporary so we can come back and revise this and say, okay, let's give you another shot at Voc Rehab, see if you can do better. Let's see if there's something with your degree in business and your degree in paralegal and your degree in poli sci and all of your experience in the car dealership and see what else you can do on that. Let me ask you a point of question. In deciding this case, do we need to announce an overarching policy decision and whether or not the second go-around is required, or could we simply decide this case on the manifest weight and say the commission didn't err under the circumstances of this case? You can always make an award on a firm on manifest weight. I'm suggesting to you, sir, that the arguments and the public policies underneath it, given the weight of the fact that we're dealing with a wage differential, given the fact that public policy on wage differential has shifted based on what was done this time last year in Springfield when they were beginning to contain the wage differential awards, that that's a reason, that's a point, an objective point that I can say here, this is a reason you should revisit the duration and the reviewability of that without at all interrupting the situation of whether 19-H applies for economic revisions. It's, you know, much as I would love to see that happen, it's not going to happen here. But you can give back to the employers the ability to continue to look at this and do what they can because, one, the facts support it. Two, the Petitioner here cooperated and agreed to it, said he was interested. And three, because the legislature has said we're looking at this again. And so if they're looking at this, I submit to you that it's proper for you to look at this. But, of course, you know, it's within your purview. If you want to say manifest weight, the Commission had the right to do it, that's fine, they did. But when they did their decision, neither the 8d1 section had been amended nor had ArcelorMittal's deal come down. And those are two objective bases that I submit to you that you can rely on to reverse and remand with instructions as set forth in my brief. And I thank you. Counsel, please. May it please the Court, Counsel, Mike Rahm on behalf of the Petitioner. One thing that both sides agreed to in this case is as a result of Mr. D'Onofrio's injury, he can't return to what he always did, and that was being an auto mechanic. When that was determined and everyone agreed to it, very early on in the case, the respondent hired Dan Minnick to help him with vocational rehabilitation. And, again, everyone agrees that my client, talk about mitigating damages, did everything to mitigate damages, cooperated 100 percent, and Minnick also did a good job. There were 250 job contacts, and talk about mitigating damages, again, he got a pillar, a lot of it was commission. He went to Minnick and said, hey, I got a job, should I take this? And the respondent said, no, we think you can do better than that. We think you can get a better job and you can mitigate your damages even more. Job continues. D'Onofrio cooperates with Minnick. Second job offer, go to respondent, hey, should I take this job at Chrysler? I'm going to make $12 an hour, 40 hours a week. Yes, you should. Take it. And he does. And he hates it. Can't stand it. It's three-hour travel to and from work, and he gets Sunday off. He gets another day off, but he never even knows when it's going to be. It changes constantly. But you know what? He does it. And why? Because autos and cars, that's what he does best. And at the time that this vocational rehabilitation is taking place, he has all this education that counsel refers to. I would submit a paralegal certificate for this man. It's useless. This guy is an auto guy. He's a car guy. He finds a perfect fit working in this service department that fits in with his physical restrictions and fits in with his what he's going to make. Counsel, did he cooperate at all with the second go-around in both rehabs? I would submit that he would. And I'll tell you why. He did. He did. He absolutely did. And the reason is when we look at when he gets this job and he takes it at respondent's request and he's working at it, he agrees he doesn't like it, but he's going to do it, and then he's going to start the second one. What happens is that there's a difference between that and the first round, and that is that he's working full-time and traveling full-time. Nothing in Minick's life changes, and yet he doesn't perform the same kind of services. What Minick does at that point is simply sends him e-mails. Doesn't even meet with him. Met him once at court when we were trying to get this case tried the initial time. Doesn't meet with him. Doesn't do anything. Sends him unfiltered job applications, some of which I point out are ridiculous. One of them is in Poland. One of them is in Texas. Many of them are ones that he already applied at in the first round and were rejected from. D'Onofrio does everything he can, in my opinion, with the change in his life, and that change is he's working a job that they got him that they consider to be a successful outcome. So is it your position he had no further obligation to try? As counsel seems to be suggesting, he should have continued to look? I think, well, two things. I don't think that he had any obligation to continue based on the letter of your vocational rehabilitation. Anything he does after that is gravy. I don't think he has any legal requirement to continue. They got him a job. They declared it successful voc rehab. That's end of story. Anything he does after that, I think he's not required to do. He wants to do it because he doesn't like this job and because he has to travel so much for this job. He has absolutely zero requirement to do anything else. Why? Because their vocational rehab counselor has declared it a successful outcome. So when you respond to counsel's argument, we should announce an overarching policy about the continuing obligation of the claimant in this case? Well, in that case, every single time that he showed up for trial and it was a wage differential, the respondent would say, stop the horses. We're going to do another round. Every single time. There would be no end to this whatsoever. And it's funny because I think there's something about that in counsel's case proceeding under 8D. When we showed up, there was no problem. There was no objection. There was nothing on the record to say, hey, wait a minute. We're trying to vote this guy still. Let's go to the compensation issue. Assuming your position, the wage differential seems that we have a $1,200 or $1,000 left on the table all the time that's not being taken into consideration in terms of compensation if you're fine. Are you referring to the bonus? Well, I'm referring to the compensation. Is it bonus or is it compensation? We're referring to the money. Right. I mean, that's $12,000 a year. Right. It would seem to me to be the essence of this case. And I think it is, too, and I think that's why in the conclusion of respondent's brief all the time they just say that, you know, the wage differential should be changed, not that it's not a wage differential. And I think we have to look at when he's hired at that job. There's no mention about any $1,200 on the table. He gets 40 hours a week. He gets $12 per hour. There was never any mention of it to anybody, to the petitioner, to Mnick. It's never mentioned. Okay. The facts are, after two months or so, that the three service fellows are bringing in consistently $1,200 a month each. Correct. And I would argue that that's a bonus. And it's interesting that the Midel-Steele case that we both interpreted differently, because I interpreted it to say that when you're having this kind of an incentive bonus and it's mandatory and it must be paid to the petitioner, that it's going to be That's absolutely not the case in this case. In this case, the money that he's receiving is at the complete whim of the employer. Mr. Ruprecht, his supervisor, testified, not only do I not have to give that to him, I've in the past had employees in the same position that I haven't given it to. We don't have to give it. He's not under a collective bargaining agreement. And that's what all these cases that talk about carving out an exception to a bonus talk about, collective bargaining agreements, being required to do certain work to get this money. My guy is not. He is not. This is at the whim of the employer. It can be taken away at any moment. He does not have to receive it. And that's the difference. And that's what you talked about in the Midel-Steele case. In that case, it was as part of a collective bargaining agreement. It was mandatory. In this case, it's not. He didn't get it initially when he was hired. It can be taken away at any moment. They've had employees in the same position that they didn't give it to. They can pay people over there any way they want to. So whether he's a union employee or not a union employee, it's immaterial. I mean, his injury caused him not to be a union employee anymore. So it's as a result of this injury. But this fits in perfectly with Midel-Steele. This is they can take it away at any moment at any point they want. So you're just saying it's not a matter of contractual right? Absolutely not. Absolutely not. And Mark Rupert said that. He doesn't have to pay him this benefit. So this is clearly a bonus. And I would also point out it's really not incentive pay. I mean, he doesn't get paid for the work that he does. This idea that work harder, work harder, and you're going to get more is not necessarily true. He could be sick, he could be out of work, and he's still going to get the bonus. More importantly, I think he could be the hardest worker there, he could be doing more work than anybody, and still book less hours because it has nothing to do with what he does. It has to do with the people coming in and what the computer books out the hour. So he might just be an unlucky guy, and the only people coming in need their tire changed, while the other guy gets one, you know, transmission or something, and he's suddenly booked less hours on the computer. It has nothing to do with how hard he's working. It has to do with the general whole. In the same way, if me as a lawyer, at the end of the year, I get a bonus based on what the firm does, but my boss has all the great cases and I have a bunch of finger cases, I still get a bonus. Well, that has nothing to do with how hard I work. I might have worked harder than him, but he had one great case that brought in tons of money. It doesn't have anything to do with the work that Mr. D'Onofrio is doing. I mean, obviously, we can take it to its logical conclusion. He's got to do something. But, again, I would argue he could be the hardest worker there and still book the least amount of hours. I think that's the difference. I mean, if this were part of a collective bargaining agreement, if this was mandatory, if he had to get it, if he didn't work hard, you know, some of the cases, if you look at them, the people, if they didn't show up to work or they didn't book the amounts that they were supposed to, they got fired. It was all mandatory. This is not. Counselor, your time is up. Thank you. Rebuttal, please. Thank you. Yes. With deference to counsel, with whom I know well and respect, I don't recall reading in the trial record that Mr. D'Onofrio hated the job when he took it. I saw that he had complained at trial after he'd been there at that point 16 months he didn't like the commute. But when he started, he seemed to be pleased with the job. He did it well. And if you hate a job, you generally don't do it well. So that three months after, they put him on the incentive plan for which he was making decent money. I think you said $1,000 a week. My numbers, as I'm arguing here, are not as good as they are on paper. Counsel, back to the bonus thing for a second. You cited Arcelor as controlling here. Your opposing counsel has made, I think, a compelling argument to distinguish it. At Arcelor, it was a matter of contractual right. It was mandatory by virtue of the labor agreement. Here, it was not mandatory. It was not covered by a contractual agreement. And it was strictly at the whim of the boss or management according to the testimony. Are those not legitimate distinguishing features? I think the whim of the boss issue is a red herring, with all due respect. For those of us who are at-will employees, our bosses can come into us every day and say, I'm changing your salary from this, I'm changing your salary from a salary to a draw, and you're going to get a percentage of the finger cases that Mr. Rahm has been assigned to as opposed to the heavy cases. It doesn't happen that way. But setting that aside, here, was it a matter of contractual right and was it mandatory? It was not mandatory insofar as there's no contractual right to compel it. But I would submit to you that you need only pick up the newspaper to find out that union workers are having their wages attempt to be chopped unilaterally in various other contexts. It's not, you know, it's not a guarantee. We have some flippant comments we occasionally make across the street about the 13th Amendment, but it's just you don't get a guarantee. Even if you've got a union contract, things happen. And I think that it's a distinction that is not important in this case because in ArcelorMittal, they talked about the pay scheme that involved an incentive bonus, and we've got a pay scheme here which involves an incentive bonus. And whether there's a contract that compels it or a boss who says he's going to do it is not, should not be determinative. If you look at 8D1, the language there, it says how much a person is able to earn in wages after he comes back to work. And whether you do it under a union contract or whether you do it under indentured servant wages or whether you do it as an at-will employee, it's money you're able to work, able to earn after you've come back to work. So I would submit, sir, that it is, it's not an important difference in these particular circumstances. I suggest to you that Mr. Roms made my argument for me about why this should be temporary partial as opposed to 8D1. The fellow came back to work at $12 an hour. Three months later, he was on a bonus plan. If you include that in there, that represents a substantial increase of money to him, okay, and a decrease of money that my client has to pay out, but it's a change that we were able to make because the award was not permanent. He improved his position, you know, through his own efforts, although apparently at a job he hated. So I would submit to you that that's a good reason to keep this as a temporary partial until we know that the fellow is permanently set in a job that he likes, he can do well, and that he's maximizing his vocational potential. I would suggest to you, however, that ArcelorMittal gives you a reason to review the financial computations and that it is proper to allow parties to have second rounds or multiple rounds of vocational rehabilitation under certain circumstances, this one being one of them. Thank you. Thank you. The court will take the matter under adjournment for disposition. We'll stand in recess.